RENDERED: APRIL 26, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2016-SC-000367-MR

DATE 5/17/18 Kim Redmon, DC

MELINDA TURNER                                                          APPELLANT

ON APPEAL FROM SCOTT CIRCUIT COURT
V.           HONORABLE PAUL F. ISAACS, JUDGE
NO. 10-CR-00255

COMMONWEALTH OF KENTUCKY                                               APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

### AFFIRMING

Melinda Turner was convicted of the stabbing death of her boyfriend, Maxwell Pomeroy, Jr. She appeals as a matter of right from a judgment of the Scott Circuit Court sentencing her to thirty years' imprisonment for murder and for being a first-degree persistent felony offender. Turner alleges that the trial court erred by: 1) permitting the Commonwealth to elicit testimony from the coroner about the victim's estimated time of death; 2) denying her motion to continue the trial; 3) granting the Commonwealth's motion to disqualify one of her attorneys; 4) allowing the Commonwealth to introduce evidence about the victim's state of mind prior to his murder; and 5) failing to properly instruct the jury as to self-defense and extreme emotional disturbance. For the following reasons, we affirm the judgment and sentence.

## FACTS AND PROCEDURAL HISTORY

Over a period of several months, Turner and Pomeroy had a tumultuous courtship which ended with Pomeroy's death by stabbing on August 9, 2010. Initially, Turner and Pomeroy lived in a residence with Pomeroy's parents, but later the couple moved into an Owen County farmhouse owned by Turner's family. Due to their turbulent relationship, Turner and Pomeroy briefly stopped seeing each other. At one point, Pomeroy expressed an interest in moving to another state to get away from Turner, but he ultimately remained in Kentucky. Eventually the couple reconciled, with Pomeroy moving into a house with Turner and her family in Georgetown, Kentucky, where he resided at his death.

Several weeks before the murder, Turner and Pomeroy visited Misty Johnson's residence, and while there they argued over Pomeroy's interest in moving back in with his parents. Two days before the murder, Pomeroy and Turner had another altercation which spilled out into the yard outside their home. According to Gina Jones, when she arrived at her mother's home that Saturday evening, she observed Pomeroy standing over Turner outside the couple's residence. Jones recalled Pomeroy's explanation for the altercation — Pomeroy was concerned that Turner was going to stab and kill him and that she had succeeded in chasing him from their home. Jones described Turner as being loud and aggravated. After Jones asked the pair if she needed to call the

police, Pomeroy requested that she not contact them explaining that the pair had been drinking.[1]

Less than forty-eight hours later, Pomeroy was dead. The morning of the murder, Turner and Pomeroy appeared to be getting along as they cooked breakfast together. That night, however, Turner contacted the police to report that three black men had broken into their home and murdered her boyfriend. Approximately two minutes after Turner's call to 911, Deputy Mike Litteral arrived at the scene of the crime. Deputy Litteral recalled not hearing anything when he initially arrived at the home, but after Turner observed him through the window, she began to scream and cry hysterically. The residence was in shambles with items out of place or damaged. When questioned by the police, Turner reiterated that three black men had broken into the home and murdered Pomeroy. Pomeroy had a stab wound, three inches wide and over six inches deep, that penetrated his heart and a superficial stab wound near his back shoulder blade.

After the police confirmed that Pomeroy was dead, they contacted the Scott County coroner, John Gobles, who arrived on the scene approximately eight to ten minutes later. Upon examining Pomeroy's body, the coroner concluded that Pomeroy had been dead for two to three hours, which directly contradicted Turner's account that he had been murdered minutes before she contacted the police. Accordingly, the police focused their investigation on

---

[1] During trial, Turner established that Jones had previously told the police that when she arrived at her mother's residence Turner had yelled at her to call the police.

Turner. Examination of Turner at the hospital revealed a bruise on her arm and a small waist abrasion, but no obvious hand injuries. At the hospital, Turner was tested for the presence of drugs and alcohol, and while there were no drugs found in Turner's system, her blood alcohol concentration nearly five hours after she called the police was .09%.[2]

While Turner claimed that one of the three unknown assailants killed Pomeroy, she allegedly told a different story to her friend, Misty Johnson. According to Johnson, Turner admitted to accidentally stabbing and killing Pomeroy. Further, Turner informed Johnson that she had asked her brother to dispose of the murder weapon and considered asking him to bury the body as well.

In November 2010, Turner was indicted by the Scott County grand jury for the murder of Pomeroy as well as for being a first-degree persistent felony offender. Turner's trial was frequently delayed for reasons not apparent from the record on appeal, and she was not tried until January 2016. At trial, Turner declined to testify. As noted, she was convicted of wanton murder and for being a first-degree persistent felony offender, and the trial court sentenced her to thirty years' imprisonment as recommended by the jury.

**ANALYSIS**

**I. The Coroner's Testimony Regarding Pomeroy's Time of Death Was Properly Admitted.**

---

[2] Forensic examination of Pomeroy indicated that his blood alcohol concentration was .129% at the time of his death.

Turner alleges that the trial court erred by permitting the Commonwealth to introduce the testimony of the local coroner, Gobles, concerning time of death.[3] Prior to trial, Turner filed a motion to exclude Gobles's testimony contending that he was not an expert in determining time of death and that the method he used to render his conclusions did not satisfy the requirements of Kentucky Rule of Evidence (KRE) 702. The trial court denied Turner's motion after hearing argument at a hearing on December 11, 2015.[4]

At trial Gobles testified that he had been the Scott County coroner for fourteen years. Prior to his service as coroner, Gobles worked for the Kentucky State Police for twenty years. In his coroner position, Gobles received in-service training with the medical examiner along with eighteen hours per year of continuing education. In addition to his statutorily-mandated training, pursuant to Kentucky Revised Statute (KRS) 72.415, Gobles stated that he had conducted approximately 1,500 death investigations.

After stating his qualifications, Gobles explained to the jury that a series of factors, mostly related to changes to the victim's body, are involved in assessing time of death. Among the factors that he would consider are: (1) the

---

[3] Turner contends that the admission of this evidence deprived her of a right to a fair trial violating her rights under the Sixth and Fourteenth Amendments to the United States Constitution and Sections Two, Three, Seven, and Eleven of the Kentucky Constitution.

[4] Due to technical issues, the audio for the video recording of the December 11, 2015 hearing is unavailable. The parties prepared a narrative statement, pursuant to Kentucky Rule of Civil Procedure (CR) 75.13. On this issue, it states that the parties "[r]ehashed grounds made in defense motion filed December 3, 2015, regarding Coroner Gobles being permitted to testify as to the time of death."

5

time the victim was last seen alive; (2) whether livor mortis had set in (can start within thirty minutes and is visible after approximately one hour); (3) whether rigor mortis had set in (can occur after a minimum of one hour, but usually occurs after two to three hours); (4) changes in body temperature (typically body temperature decreases 1.5 degrees per hour until the body reaches room temperature); and (5) whether there was pooling of blood (while also considering whether there had been changes in the color of the blood or if it had dried).  Gobles stated that none of these factors is dispositive, rather he considers each factor in assessing time of death.

After being contacted by police, it took Gobles approximately eight to ten minutes to arrive on scene.  Although he was informed that the murder was the result of a just-completed home invasion, Gobles observed several factors which cast doubt on the idea that the murder had just occurred.  Specifically, Gobles noted that rigor mortis had set in and that the body was very stiff, suggesting that Pomeroy had been dead for approximately two hours.  Additionally, blood from Pomeroy's body had pooled and blood smears on his pants had dried.[5]

Gobles assessed Pomeroy's body temperature with a thermometer.  Gobles explained to the jury that the most accurate way to assess body temperature is to put the thermometer in the liver, but at the time of this

---

[5] Several law enforcement officers who attended the crime scene also testified to the pooled and congealing blood and the condition of the body based on their observations.

murder he had not yet been trained to perform that procedure. Gobles identified two alternate methods to assess body temperature, rectally or aurally. He opted to assess Pomeroy's body temperature aurally. Testing of Pomeroy's ears revealed a left ear temperature reading of 94.4 degrees and a right ear temperature of 94.2 degrees. Based on these temperatures, Gobles concluded that Pomeroy had been dead for two to three hours. Gobles mentioned some potential considerations to be mindful of when relying on body temperature to assess time of death, including: (1) not everyone's normal body temperature is 98.6 degrees; (2) any external source of heat; (3) cooling sources; and (4) illness. Gobles testified that he did not recall seeing a cooling or heating source that would have impacted his examination nor did he have reason to believe that Pomeroy had been sick. While Gobles concluded that Pomeroy had died approximately two to three hours prior to his examination, he noted that he was unable to identify with certainty the exact time of death.

When cross-examined by Turner, Gobles stated that while he had looked at the thermostat to identify the room's temperature, he had not recorded that temperature. Gobles also acknowledged two additional factors that could impact a body's cooling, *i.e.*, the presence of alcohol and the victim having a larger body mass.

The admissibility of expert testimony is evaluated pursuant to KRE 702. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

7

experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

KRE 702 was drafted in response to *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993), which mandated "the trial court to play the role of 'gatekeeper' to prevent the admission of 'unreliable pseudoscientific evidence.'" *Holbrook v. Commonwealth,* 525 S.W.3d 73, 78 (Ky. 2017) (*citing Miller v. Eldridge,* 146 S.W.3d 909, 914 (Ky. 2004)). "[A] trial court's task in assessing proffered expert testimony is to determine whether the testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (*quoting Futrell v. Commonwealth,* 471 S.W.3d 258, 282 (Ky. 2015)).

To assess whether the proposed expert testimony is reliable, a trial court may consider a number of non-exclusive factors including: "whether the principle, theory, or method in question 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether it has a 'known or potential rate of error,' and whether it enjoys acceptance within 'a relevant scientific community.'" *Futrell,* 471 S.W.3d at 282 (*quoting Daubert,* 509 U.S. at 593-94, 113 S. Ct. at 2796-97). "We review a trial court's determination whether a witness is qualified to give expert testimony for an abuse of discretion." *Smith v. Commonwealth,* 454 S.W.3d 283, 285-86 (Ky. 2015) (*citing Brown v. Commonwealth,* 416 S.W.3d 302, 309 (Ky.2013)). "The test for abuse

8

of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky. 2000) (*citing Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999)).

In the case at bar, it appears that the trial court did not conduct a formal *Daubert* hearing. Further, due to the aforementioned audio recording issues during the hearing on this issue, we do not have the benefit of counsels' oral arguments or the trial court's thoughts as to why the proffered expert testimony was admissible. However, our review of the available record demonstrates that the trial court did not abuse its considerable discretion in concluding that Gobles was an expert or permitting him to offer his opinion concerning the time of Pomeroy's death.

Turner takes issue with Gobles being permitted to testify claiming that he was not an expert and that "the 'science' of time of death is severely lacking credibility." We disagree with Turner's assertion that Gobles was not an expert. Turner seeks to diminish Gobles's experience by emphasizing that he is not a licensed medical doctor and that he had only one hundred and four hours of medical training to determine time of death. This argument purposefully overlooks Gobles's significant experience both as Scott County coroner for fourteen years and with the Kentucky State Police for twenty years. Moreover, as part of his professional experience as coroner, Gobles conducted approximately 1,500 death investigations. As such, Gobles's background,

training and experience qualify him to render an opinion on the timing of Pomeroy's death.

Further, Turner's criticisms about the methods Gobles employed to assess Pomeroy's body temperature are unpersuasive to bar Gobles's testimony. These criticisms were properly brought out on cross-examination and Turner was able to argue to the jury about what weight or credibility they should afford Gobles's testimony. In sum, due to Gobles's considerable experience with death investigations with the Kentucky State Police and as the Scott County coroner, along with the training and education he received in the latter position, we cannot say that the trial court abused its discretion in permitting him to testify as an expert.

We also reject Turner's contention that Gobles's expert testimony was not reliable.[6] As admitted by Turner, Gobles did not offer a definitive time of death, but rather offered his expert opinion to identify a general time frame during which Pomeroy had died. Gobles's testimony had the proper caveats so that the jury was aware that he was only identifying a general time frame during which he believed that Pomeroy's death occurred.[7] Moreover, Gobles's

---

[6] Turner contends that "[r]epeatedly in caselaw, it is held that a coroner's method of calculating time of death cannot truly be tested because there are too many factors that must also be considered." In support of this argument, Turner relies on *Sutton v. Carpenter*, 617 Fed. Appx. 434, 436 (6th Cir. 2015) and *People v. Ramirez*, 139 P. 3d 64, 39 Cal. 4th 398, 407-08 (Ca. 2006). However, having reviewed these cases, they do not support the proposition advanced by Turner.

[7] Turner's brief refers to the testimony of Dr. Hunsaker, the medical examiner, who opined that assessing time of death absent a witness at the scene is always an estimation, a view which is in accord with Gobles's testimony.

10

approach was consistent with the publications cited to this Court by Turner. *See, e.g.,* Samuel D. Hodge Jr. & Nicole M. Saitta, *Behind the Closed Doors of the Coroner's Office--the Medical/Legal Secrets Involving an Autopsy,* 32 Temp. J. Sci. Tech. & Envtl. L. 1, 6 (2013) ("time of death and [the postmortem interval] cannot be determined with exactness and are merely given as estimates and ranges"). Additionally, the techniques employed by Gobles to assess time of death generally match those identified in the publications cited to the Court – "[t]he traditional method of establishing the time of death is the rate method, and common factors utilized include the rate of cooling of the body (algor mortis), the initiation and duration of rigor mortis and livor mortis, as previously discussed, determination of potassium concentration in the vitreous humor of the eyes, and forensic entomology." *Id.* at 7. Further, we note that Turner was able to attack Gobles's estimation of Pomeroy's time of death through vigorous cross-examination. The trial court did not err in admitting Gobles's probative and relevant testimony.

## II. The Trial Court Did Not Abuse Its Discretion in Denying Turner's Motion for a Continuance.

Turner contends that the trial court erred by failing to grant her motion to postpone the trial.[8] In April 2011, four months after Turner's arraignment, the trial court scheduled Turner's trial for March 2012, but the trial did not

---

[8] Turner argues that the trial court's denial of her motion to continue violated her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections Two, Three, Seven, Eleven, and Seventeen of the Kentucky Constitution.

11

occur as scheduled. Turner's trial was postponed repeatedly going forward. Among the dates selected for Turner's case to be tried were: January 22, 2013; July 15, 2013; August 26, 2013; January 27, 2014; July 27, 2014; and December 15, 2014.[9]

On December 4, 2014, Turner requested that the December 15, 2014, trial date be continued. As a basis for the motion, Turner's counsel argued that he had recently learned that Turner had been previously hospitalized in a mental institution and needed time to obtain and review records concerning her hospitalization. Turner's counsel also claimed to have just learned of Pomeroy's treatment at a psychiatric institution and requested access to relevant materials concerning that treatment. Additionally, defense counsel Douglas Crickmer noted that he had been informed recently by the Commonwealth that Casey Holland, who was serving as Turner's co-counsel with Crickmer, had represented Pomeroy in a fourth-degree assault case, in which Pomeroy was the defendant and Turner was the alleged victim.[10] Defense counsel explained that "[t]his representation occurred shortly before Max Pomeroys (sic) death. Mr. Holland is an experienced litigator with several murder trials under his belt, and it appears at this point that Mr. Holland may have to be replaced."

---

[9] It is unclear as to why Turner's trial was rescheduled on these dates. While the written record identifies that Turner's trial was repeatedly postponed, it does not provide any explanation for these delays. Also, video recordings from the pretrial conferences in which the rescheduling of Turner's trial was likely discussed were not made part of the record on appeal.

[10] Holland apparently did not remember his prior representation of Pomeroy.

Responding to Turner's motion to continue, the Commonwealth questioned why the defense had not investigated these mental health issues earlier and noted that Pomeroy's hospitalization had been referenced in discovery turned over to Turner shortly after her arraignment. With regard to Holland's prior representation of Pomeroy, the Commonwealth stated "[t]his matter will likely become a relevant (and contested) issue in the trial of the above-styled case. The Commonwealth believes, therefore, that Mr. Holland cannot ethically represent Ms. Turner at trial. It should be noted that the Commonwealth became aware of this conflict approximately one month ago and immediately notified Mr. Holland of its concern."

The trial court granted Turner's motion to continue and the case was rescheduled for trial on August 17, 2015, with a backup trial date of December 14, 2015. On July 9, 2015, Turner requested a continuance from August to the December backup trial date on the grounds that Holland was unavailable to participate due to medical issues. Turner explained that Holland had been "involved with this case as co-counsel for four years and was responsible for close to half of the witness trial examination work[.]"[11] Further, due to staffing issues, Turner opined that another attorney would be unavailable to assist in August but could be available by the December 2015 trial date, if Holland was unable to return.

_____

[11] Later, in disqualifying Holland, the trial court stated he entered the case in late 2014. It is unclear from the record when exactly Holland became co-counsel for Turner.

In its objection to Turner's motion to continue, the Commonwealth noted that this was the second occasion in which Turner had moved for a continuance due to Holland taking an extended leave of absence. Also, the Commonwealth explained that "[it] had spent considerable time and resources preparing for the August 2015 trial[,]" the case had been pending in circuit court for nearly five years, and that even without Holland, Turner was represented by skilled counsel who had sufficient time to prepare for trial.[12]

Turner's motion to continue was granted and her trial was rescheduled for December 14, 2015. However, the trial did not begin on that day because the trial court issued an order removing Holland as co-counsel for Turner. In order to give the "Department [of Public Advocacy] ample time to provide substitute counsel" to assist Turner's remaining attorney, the trial court rescheduled Turner's jury trial for January 19, 2016.

On January 4, 2016, Turner filed yet another motion to continue her trial. The basis for this motion, was Turner's newly-assigned counsel's claim that health problems and managerial responsibilities were impacting his ability to prepare for trial. The trial court denied Turner's requested thirty-day continuance on January 8, 2016.

Pursuant to Kentucky Rule of Criminal Procedure (RCr) 9.04, the trial court may grant a postponement of trial if sufficient cause is shown by either party. In considering whether to grant a motion for a continuance, the trial

---

[12] Crickmer had been assigned as Turner's counsel at or shortly after arraignment and continued to represent her throughout the pendency of her case.

14

court is vested with broad discretion. *Dishman v. Commonwealth*, 906 S.W.2d 335, 339 (Ky. 1995) (*citing Pelfrey v. Commonwealth*, 842 S.W.2d 524 (Ky. 1993)). In *Snodgrass v. Commonwealth*, 814 S.W.2d 579 (Ky. 1991), *overruled on other grounds by Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001), we identified seven factors trial courts should consider in assessing whether to grant a motion for a continuance. *Id.* at 581. Those factors are: "length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice." *Id.* (*citing Wilson v. Mintzes*, 761 F. 2d 275, 281 (6th Cir. 1985)). The last factor, identifiable prejudice, is particularly important; "[c]onclusory or speculative contentions that additional time might prove helpful are insufficient." *Bartley v. Commonwealth*, 400 S.W.3d 714, 733 (Ky. 2013).

After considering the *Snodgrass* factors, the trial court clearly did not abuse its discretion in denying Turner's motion to continue. While we agree with Turner that the complexity of her case and a minimal delay of thirty days are both factors that support granting a continuance, the remaining factors weigh heavily against Turner. Contrary to Turner's assertion that the trial court had an "arbitrary insistence upon expeditiousness," the record is clear that the opposite is true as substantial time was given to counsel to prepare this case for trial. Starting with her indictment in December 2010, Turner had five years to prepare for her January 2016 trial. Moreover, during that five-

15

year period, the trial court granted two of Turner's previous requests for a continuance and postponed the trial *sua sponte*, to permit Turner's new co-counsel additional time to prepare. Also, while new co-counsel was appointed for Turner in December 2015, Turner continued to be represented throughout the proceedings by Crickmer who had been her counsel since his appointment at or shortly after her arraignment.

In denying Turner's continuance motion, the trial court did not address whether the continuance would cause further inconvenience to counsel, litigants, or the court, but the Commonwealth's objection to her July 2015 continuance suggests the delays were negatively impacting the Commonwealth. It is self-evident that delaying a trial repeatedly over a five-year period can create unseen complications and difficulties for all participants in the trial. Finally, while Turner argues that denial of the continuance prevented counsel from investigating possible defenses and mitigating factors, she fails to identify any additional action she would have taken with the benefit of additional time. Again, Turner had five years to prepare for trial, during which her co-counsel had ample time to plan a defense and consider mitigating evidence. Weighing the factors, including especially Turner's inability to demonstrate any specific prejudice she suffered by the trial court's refusal to grant her a continuance, we cannot say that the trial court abused its discretion in denying her motion to continue.[13]

---

[13] We reject the Commonwealth's argument that Turner has failed to comply with the affidavit requirement of RCr 9.04. As Turner correctly notes in her reply

16

## III. The Trial Court Did Not Abuse Its Discretion in Disqualifying Holland From Representing Turner.

Turner alleges that the trial court erred by removing Casey Holland as her co-counsel because, in her view, there was no conflict of interest warranting his removal.[14] Prior to trial, the Commonwealth had requested the disqualification of Holland due to his prior representation of Pomeroy. That representation began in April 2010, when Holland was appointed to represent Pomeroy, who had been charged with assault in the fourth degree (domestic violence) against Turner. The case against Pomeroy was continued in district court for one year, with the apparent understanding that it would be dismissed. However, while the case was still open, Pomeroy was murdered. Subsequently, Turner was charged with Pomeroy's murder and Doug Crickmer was appointed to represent her. In late 2014, Holland was also assigned to represent Turner as co-counsel.[15]

In November 2014, the Commonwealth learned of Holland's prior representation of Pomeroy and alerted defense counsel and the trial court about its concerns. Specifically, in responding to Turner's December 2014 motion to continue, the Commonwealth stated that Holland's prior representation "will likely become a relevant (and contested) issue in the trial of

---

brief, the affidavit requirement of RCr 9.04 is inapplicable in this case as "absence of evidence" or "absence of a witness" was not the basis for the motion to continue.

[14] Turner contends that the trial court's disqualification of Holland violated her rights under the Sixth and Fourteenth Amendments to the United States Constitution and Sections Two, Three, Seven, and Eleven of the Kentucky Constitution.

[15] *See* footnote 11 and accompanying text.

the above-styled case. The Commonwealth believes, therefore, that Mr. Holland cannot ethically represent Ms. Turner at trial." Despite this belief, the Commonwealth did not file a motion to disqualify Holland until June 2015.

Subsequently, the trial court conducted a detailed review of the issue by: hearing arguments from counsel, conducting *ex parte* hearings with both the Commonwealth and Turner's counsel concerning the proof in the case at bar, and considering materials submitted by Holland. Specifically, Holland submitted two memoranda prepared by senior attorneys with the Department of Public Advocacy (DPA), expressing their respective views that a conflict of interest did not exist.[16] Additionally, Holland shared information with the trial court that he obtained from contacting the Ethics Hotline of the Kentucky Bar Association.

After considering all of the available information, the trial court concluded that there was a potential problem which mandated Holland's disqualification. The trial court was emphatic that "that there is no implication in this matter that Mr. Holland has done anything improper, that he is knowingly doing anything improper in this matter, or that any of his

_____

[16] Due to the policies of the DPA at the time of these events, Holland's file detailing his representation of Pomeroy in the assault case had been destroyed. Accordingly, there was no means for Holland to refresh his recollection regarding his representation of Pomeroy and both DPA memoranda were based on Holland's recollections of the case rather than an independent review of Holland's case file. The DPA attorneys generally opined that the Pomeroy murder prosecution was not substantially related to Pomeroy's domestic violence charge involving Turner, and one suggested (without any apparent basis) that Holland learned nothing in his representation of Pomeroy not otherwise known to a member of the public accessing court records.

representation has resulted in improper or unethical conduct by Mr. Holland." Moreover, the trial court praised Holland for his honest and frank answers when questioned as to any potential information that could trigger the disclosure of information he was aware of due to his representation of Pomeroy.

Despite Holland's candor, the trial court concluded that the two cases -- Pomeroy's assault case and Turner's murder case -- were materially related. The court focused on Supreme Court Rule (SCR) 3.130 (Rule 1.9(a)) which provides that a lawyer "who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client gives informed consent, in writing." Rule 1.9(c) prohibits the lawyer from using information relating to the prior representation to the disadvantage of the former client or revealing information about that representation except as otherwise allowed by the Rules of Professional Conduct.

After noting the timing of events involved in both cases, the trial court explained that "[t]here is a relationship between the two parties because at the time of the assault and Mr. Pomeroy's murder, Ms. Turner was his fiancé (sic) and the nature of their relationship is a potential issue in this case even though the defense is not raising self-defense."[17] Additionally, despite Turner signing waivers of any potential conflict concerning Holland's representation of

_____

[17] Later, at trial, Turner's counsel sought a self-defense instruction.

19

Pomeroy, the trial court noted that Pomeroy was unable to consent to any potential problem as the rule envisions. The trial court was also "very much concerned that there is evidence that could be introduced in this case by the prosecution that could raise a definite problem for Mr. Holland concerning his representation and loyalty to Mr. Pomeroy." Further, the trial court concluded that this conflict, which Holland would be obligated to reveal when it occurred, "could very possibly result in a mistrial."

The trial court also expressed its concern about the public perception that justice was being properly administered if it were to permit Holland to continue to represent Turner. While the trial court was explicit that public perception alone should not mandate disqualification, the trial court was concerned about the appearance of Holland representing a defendant accused of killing Holland's former client, a man who was still his client at the time of his death. Noting this was "a very unique case and will happen, if ever again, very rarely," the trial court held that disqualification was necessary to protect against "future ethical problems concerning [Holland's] representation of his current client and his duties as an attorney for a former client, the alleged victim in this case. This will ensure the public that the [trial court] is acting fairly to all parties and that justice is being served."

While the defendant's right to counsel is fundamental, there is no categorical right to the choice of specific counsel. *Commonwealth v. Maricle*, 10 S.W.3d 117, 121 (Ky. 1999); *see also Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 1700 (1988) (holding that a trial court "must recognize a

20

presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict."). While disqualification is a drastic remedy that should be employed sparingly, we have held that it is warranted on occasion. *See, e.g., Shoney's, Inc. v. Lewis*, 875 S.W.2d 514 (Ky. 1994) (disqualifying counsel and suppressing information obtained by those attorneys). We review a trial court's ruling on a motion to disqualify an attorney for abuse of discretion. *Calhoun v. Commonwealth*, 492 S.W.3d 132, 138 (Ky. 2016).

Turner contends that the trial court's determination that the cases were substantially related was erroneous. She argues that Holland could ethically represent "Turner because not only was information from the case regarding Mr. Pomeroy not used in the representation of Ms. Turner, but Mr. Holland did not even remember that he had represented Mr. Pomeroy, let alone what the case was even about." Further, Turner contends that to the extent there was a conflict, Pomeroy's death removed it.

We disagree and conclude that Holland's prior representation of Pomeroy could have compromised his representation of Turner. The trial court with the benefit of a detailed hearing, including *ex parte* proceedings to assess the parties' intended trial strategies, determined that there was a sufficient likelihood of an ethical conflict. Due to his prior representation of Pomeroy, the murder victim, in an domestic violence assault case where Turner, his current client, was the victim, Holland was potentially aware of information which

21

could have become relevant at trial. If during trial Holland recalled information obtained during his representation of Pomeroy that would be relevant in his representation of Turner, he would face a serious dilemma about how to best protect the interests of both Pomeroy and Turner. The trial court with the benefit of detailed information from counsel, was deeply concerned that this circumstance could indeed come to pass. In that event one of two equally unappealing scenarios would occur: 1) Holland would be compromised in his representation of Turner, by not being able to effectively cross-examine witnesses and fully present a defense based on the information concerning Pomeroy or 2) Holland would disclose information about his prior representation of Pomeroy, potentially triggering a mistrial.

Moreover, it appears that the trial court's concern was warranted given that Turner's trial attorneys ultimately requested instructions for extreme emotional disturbance and self-defense. In making an argument for the inclusion of those instructions, there is a significant chance that Holland's prior knowledge through representation of Pomeroy could have led to disclosure of information which would be relevant to Turner's case, but at the same time create an unacceptable conflict of interest for Holland.

While Turner emphasizes Pomeroy is not a living client, the obligations of counsel under SCR 3.130(1.9) survive the death of the client. Although this Court has never clearly addressed the matter, it is generally accepted throughout the country that the attorney-client privilege survives the client's death except in certain special circumstances pertaining to testamentary

22

matters. In *Swidler & Berlin v. United States*, 524 U.S. 399, 410, 118 S. Ct. 2081, 2088 (1998), the United States Supreme Court rejected the proposition that criminal matters should be different and an attorney should be allowed to provide relevant testimony to an independent counsel following his client's death. The Court emphasized the common law rule and the adverse effect on the relationship if a client did not fully confide in his attorney for fear of posthumous disclosure. Sister state courts have consistently upheld the attorney-client privilege after the client's death. *See, e.g., In re Miller*, 584 S.E.2d 772 (N.C. 2003) ( client's communications with his criminal defense attorney remained privileged after his death and not subject to waiver by his wife-executrix for use in a criminal prosecution involving the deceased client's paramour); *Wesp v. Everson*, 33 P.3d 191 (Colo. 2001) (sexual abuse defendant's statements to his defense attorney remained privileged after his suicide and could not be revealed using a "manifest injustice" exception to the attorney-client privilege in civil suit by the step-daughter victim).

We share the trial court's concern that privileged information from Pomeroy's domestic violence case remain confidential after his death, perhaps particularly so given that the current prosecution arises from Pomeroy's murder by Turner, the victim in the earlier case. It is axiomatic that Pomeroy's interest would be served by having his murderer identified and brought to justice in a trial where no counsel was laboring under a conflict of interest. Based on the foregoing, we conclude the decision to disqualify counsel, while a

23

drastic remedy to be applied sparingly, was not an abuse of the trial court's discretion.

**IV. The Trial Court's Admission of State-of-Mind Evidence Was Harmless Error.**

Turner contends that the trial court erred by allowing the Commonwealth to introduce inadmissible hearsay testimony from Gayle Pomeroy, the victim's mother, and Justin Humphrey, a friend of the victim, about the tumultuous nature of her relationship with Pomeroy. Specifically, Turner contends that this testimony was irrelevant, but that even if relevant unduly prejudicial. [18] Gayle Pomeroy testified that her son wanted to get away from Turner, and yet the couple ultimately reconciled due to Turner's claim that she was pregnant. Similarly, Humphrey testified that Pomeroy asked him to lie to Turner about where he was to avoid seeing her. The events that Gayle Pomeroy and Humphrey testified about did not occur close in time to the murder, but rather weeks and months earlier, during a rough patch in the relationship between Turner and Pomeroy. Over Turner's objection, the trial court permitted the Commonwealth to introduce this hearsay testimony under the state-of-mind hearsay exception found in KRE 803(3).

KRE 803(3) permits the admission of hearsay testimony if it shows "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily

---

[18] Turner argues that the admission of this evidence violated her rights under the Sixth and Fourteenth Amendments to the United States Constitution and Sections Two, Three, Seven, and Eleven of the Kentucky Constitution.

health)." The party seeking admission of evidence pursuant to an exception for the hearsay rule has the burden of fitting it within the exception. *Noel v. Commonwealth*, 76 S.W.3d 923, 926 (Ky. 2002). "Whether an out-of-court statement qualifies as an exception to the bar against hearsay depends on the circumstances of each case, and the trial court's ruling will not be disturbed unless clearly erroneous." *Rucker v. Commonwealth*, 521 S.W.3d 562, 571 (Ky. 2017) (*citing Noel*, 76 S.W.3d at 926).

Turner contends that Pomeroy's state of mind was not relevant in the case at bar as it was not an issue in dispute in the Commonwealth's case nor did she invoke a defense which would make evidence about Pomeroy's state of mind relevant. Additionally, Turner argues that even if evidence of Pomeroy's state of mind was relevant, it should have been excluded under KRE 403 as it was more prejudicial than probative.

The Commonwealth responds by noting that this Court has permitted the admission of statements concerning the victim's future plans to break off a relationship with the offender under the state of mind exception to the hearsay rule. *See, e.g., Dillon v. Commonwealth*, 475 S.W.3d 1, 23 (Ky. 2015). Moreover, the Commonwealth contends that "[a]llowing this type of evidence shows estrangement and bad feelings between [Turner] and her victim. Not only does the testimony reflect the state of mind for the victim, once it was relayed to [Turner], it establishes a motive for the stabbings."

The Commonwealth construes too broadly this Court's willingness to admit evidence under the state-of-mind exception. We have permitted the

admission of evidence under the state-of-mind exception to demonstrate the victim's intent to take imminent action against the perpetrator. *See, e.g., Rucker,* 521 S.W.3d at 571 (evidence of ultimatum that in three days defendant must either find a job or else leave the victim's apartment was properly admitted); *Ernst v. Commonwealth,* 160 S.W.3d 744, 752-53 (Ky. 2005) (evidence of landlord's intention to initiate eviction proceedings against the defendant in two days was properly admitted).

In this case, the Commonwealth introduced evidence concerning a tumultuous period in the relationship between Turner and Pomeroy that pre-dated the murder. Gayle Pomeroy testified to statements in May 2010 and Humphrey to statements in early summer 2010. The murder occurred August 9, 2010. While the statements did reflect Pomeroy's state of mind at the time he made them, namely a desire to avoid Turner, these statements were too far removed from the time of the murder to be admissible under KRE 803(3). Indeed, Turner and Pomeroy ended up reconciling and living together for approximately a month prior to the murder. We reject the Commonwealth's contention that this hearsay testimony provides a motive for the stabbings or reflects a growing animosity or tension relevant to the August 2010 murder.

Gayle Pomeroy's and Humphrey's testimony concerning Pomeroy's state of mind weeks or even months prior to the murder was of minimal relevance. We agree with Turner that the trial court abused its discretion in permitting its introduction as state-of-mind testimony.

26

Although this testimony should not have been admitted at trial, that "evidentiary error is deemed harmless 'if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.'" *Gaither v. Commonwealth*, 521 S.W.3d 199, 205 (Ky. 2017) (*quoting Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009)). We conclude that the admission of this testimony was harmless error as it did not substantially sway the judgment. The Commonwealth's case against Turner was compelling, and her defense was seriously undermined by physical evidence and her admission of guilt to Johnson. Moreover, Gayle Pomeroy's and Humphrey's testimony had limited negative impact, as it only succeeded in demonstrating that Pomeroy and Turner had broken up for a time and reconciled, a common occurrence for many couples. Due to its harmless nature, the error does not compel reversal.

**V. The Trial Court Properly Instructed the Jury.**

Turner also contends that the trial court erred by failing to instruct the jury on self-defense or extreme emotional disturbance. In a criminal trial, the trial court is obligated to instruct the jury on the "whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999) (*citing* RCr 9.54(1); *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky. 1954)). This obligation extends to lesser-included offenses and affirmative defenses, but is dependent upon there being sufficient evidence to warrant the giving of an instruction. *Grimes v. McAnulty*, 957 S.W.2d 223, 226 (Ky. 1997). "We review a trial court's rulings regarding

27

instructions for an abuse of discretion." *Ratliff v. Commonwealth,* 194 S.W.3d 258, 274 (Ky. 2006) (*citing Johnson v. Commonwealth,* 134 S.W.3d 563, 569-70 (Ky. 2004)).[19]

## A. Self-protection Instruction

At a bench conference to discuss potential jury instructions, Turner asked the trial court to instruct the jury on self-protection.[20] Turner claimed that this instruction was warranted as approximately forty-eight hours before the murder, Turner and Pomeroy had engaged in an altercation outside their residence, during which Turner asked a neighbor to contact the authorities. Also, Turner claimed that a self-protection instruction was warranted due to two photographs of her that had been admitted by the Commonwealth, which reflected bruises that she alleged were caused by Pomeroy.[21]

---

[19] Turner misstates our standard of review for jury instructions, claiming that *de novo* review is required. As Turner's complaint concerns the trial court's refusal to instruct the jury on self-protection, as opposed to the wording of the proffered instruction, abuse of discretion is the appropriate standard of review. *See Sargent v. Shaffer,* 467 S.W.3d 198, 204 (Ky. 2015) ("[A] trial court's decision on whether to instruct on a specific claim will be reviewed for abuse of discretion; the substantive content of the jury instructions will be reviewed *de novo.*").

[20] Turner's tendered jury instructions contained a specific instruction for self-protection, but also required the jury to conclude that she had not been privileged to act in self-protection to convict her of murder or first-degree manslaughter.

[21] On appeal, Turner additionally argues that a self-protection instruction was warranted due to two different portions of Misty Johnson's testimony and physical evidence obtained from the scene of the crime. First, Johnson testified that she witnessed an argument between Turner and Pomeroy several weeks before his death. Second, Johnson told the jury that Turner had admitted to unintentionally killing Pomeroy. According to Johnson, the couple had been drinking and arguing the day of the murder over some pills and Pomeroy's intention to move back in with his parents. This argument, which Johnson described as fighting, was drawn out taking place throughout the house and outside the residence.

Moreover, Turner identifies four separate pieces of physical evidence that she claims support the giving of a self-protection instruction: 1) a button allegedly ripped

28

The trial court responded by asking Turner whether a self-protection instruction required danger of imminent harm as opposed to the existence of a more generalized harm. Evading the question, Turner turned her focus to the pictures of Turner's bruises and reiterated that a self-protection instruction was warranted. The trial court was unimpressed with this line of argument, explaining that there was "[n]ot one iota of evidence about how those bruises occurred[,]" and that there are "[t]en million ways people get bruises. Needs to be some evidence, that [Pomeroy] was the agent that caused those bruises." Furthermore, the trial court noted that Turner had failed to answer its question about the timing of any threat that would support self-protection and the Saturday incident was not contemporaneous with Pomeroy's murder.

The trial court properly refused to instruct the jury on the law of self-protection. "The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person." KRS 503.050(1). Turner's assertion that she is entitled to a self-protection instruction is particularly perplexing in that she has never claimed

---

from Pomeroy's shirt; 2) a broken woman's ring; 3) "trimmings and scrapings" from Turner's fingernails which had a mixture of her and Pomeroy's DNA; and 4) "trimmings and clippings" from Pomeroy's right hand which revealed unidentified foreign DNA.

Turner did not raise her argument about Johnson's testimony or the physical evidence before the trial court and as such neither argument will be considered on appeal. *See Henderson v. Commonwealth*, 438 S.W.3d 335, 343 (Ky. 2014)) (A party "may only present those issues that were fully presented to the trial court and, further, may not bring forward new legal grounds on appeal to challenge those errors.").

responsibility for Pomeroy's death. Although Turner did not testify, her counsel claimed in opening statement that she was innocent and the victim of a "rush to judgment" by the authorities. According to Turner, Pomeroy was murdered by an unknown intruder who stabbed him twice during a confrontation in their home. Turner's theory of the case is noteworthy as "[w]ith rare exception it is the rule that where the defendant denies committing the homicide at all, he is not entitled to a self-defense instruction." *Fitch v. Commonwealth*, 267 Ky. 646, 103 S.W.2d 98, 102 (1937).

Our review demonstrates that this "rare" exception does not apply to the case at bar as there was insufficient evidence to warrant an instruction for self-protection. As the trial court correctly noted, the Saturday incident between Turner and Pomeroy was too far removed in time to qualify as an imminent threat of unlawful physical force. Additionally, Turner's bruises were inadequate to warrant a self-protection instruction, given that she failed to introduce any evidence for how those bruises occurred or any link to Pomeroy. Simply put, because there was insufficient evidence presented at trial that Turner was in imminent danger of harm when she killed Pomeroy, the trial court properly denied her request for a self-protection instruction.

## B. Extreme Emotional Disturbance Instruction

Turner also claims that the trial court erred by failing to instruct the jury on extreme emotional disturbance.[22] Turner's request was based on Johnson's

---

[22] Turner's requested instruction for extreme emotional disturbance was incorporated into the first of her two tendered instructions for murder.

30

testimony that the couple had been quarrelling over some pills the day of the murder.[23] The trial court was unpersuaded by Turner's argument, explaining that there was no testimony about her mental condition at the time of the murder and, in any event, the couple's argument over pills was an insufficient triggering event for an extreme emotional disturbance instruction.

We have previously defined extreme emotional disturbance as "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986). Further, the defendant is obligated to prove the existence of a sudden and uninterrupted triggering event which leads to the violence at issue. *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky. 1991) (citations omitted). The reasonableness of a claim of extreme emotional disturbance is not evaluated objectively, but rather subjectively, from the defendant's point of view. *Holland*

---

[23] Turner contends that the "trial court denied [her an extreme emotional disturbance] instruction because it failed to consider the gravity of the sequence of events argued and preserved by Ms. Turner's attorney." Among the events Turner identifies are: 1) "romantic unrest" between the couple in the months preceding Pomeroy's death; 2) a verbal quarrel between the couple a few weeks prior to the murder; 3) Pomeroy's intention to end his relationship with Turner; 4) a physical altercation between Turner and Pomeroy less than forty-eight hours before the murder; and (5) Turner's admission to Johnson that she killed Pomeroy. This "sequence of events" argument was not presented to the trial court in support of Turner's request for an extreme emotional disturbance instruction. Rather, Turner's argument was based entirely on Johnson's testimony that the couple had been fighting over pills. Accordingly, this argument is not properly preserved and will not be considered on appeal. *Henderson*, 438 S.W.3d at 343.

*v. Commonwealth,* 466 S.W.3d 493, 503 (Ky. 2015) (*citing Spears v. Commonwealth,* 30 S.W.3d 152, 155 (Ky. 2000)).

We agree with the trial court that Turner did not present sufficient evidence to warrant instructing the jury on extreme emotional disturbance. Turner's contention that her argument with Pomeroy over pills could be a triggering event is unpersuasive. By all accounts, Pomeroy and Turner had a tumultuous relationship, in which they frequently quarreled, and Turner failed to demonstrate that their disagreement over pills was so sudden or shocking as to override her judgment and compel her to kill Pomeroy. Additionally, there was no evidence whatsoever concerning Turner's mental state on the day in question, rendering an extreme emotional disturbance instruction purely speculative. The trial court did not err in denying the instruction.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of the Scott Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Karen Shuff Maurer
Steven Goens
Assistant Public Advocates
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph Todd Henning
Assistant Attorney General
Office of the Attorney General