RENDERED: FEBRUARY 19, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0387-MR

MARY SCHULKERS                                                    APPELLANT

V.

ON APPEAL FROM COURT OF APPEALS
NO. 2024-CA-0231
KENTON CIRCUIT COURT NO. 21-CR-01580

HONORABLE KATHLEEN LAPE,                                      APPELLEE
JUDGE, KENTON CIRCUIT COURT

AND

COMMONWEALTH OF KENTUCKY                    REAL PARTY IN INTEREST
                                                                        /APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**REVERSING AND REMANDING**

Mary Schulkers brought an original action under Kentucky Rules of Civil Procedure (CR) 81, seeking a writ of prohibition in the Court of Appeals to bar enforcement of an order disqualifying her lawyer, Amy Miller, from continuing to represent her in a criminal matter based on a finding that Miller had become a potential trial witness. The Court of Appeals denied the writ, concluding that one of the prerequisites for a writ, specifically a showing of no adequate remedy by appeal, had not been proven. This Court concludes that Schulkers has adequately shown the prerequisites for the availability of a writ. Furthermore, based on the current record, the findings made by the trial court were insufficient to determine that Miller would, or most likely would, be a testifying

witness at Schulkers's trial and would therefore necessarily need to withdraw as counsel. This Court reverses and remands for entry of the requested writ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 24, 2021, a vehicle operated by Schulkers struck a pedestrian walking on the sidewalk causing serious injuries. Schulkers was indicted by a Kenton County grand jury on December 16, 2021, for second-degree assault, first-degree wanton endangerment, and operating a motor vehicle under the influence of intoxicants.

Miller, a public defender, was appointed and entered her appearance on behalf of Schulkers on January 3, 2022. Bond for Schulkers was originally set at $2,500.00 cash but at her arraignment the Commonwealth moved to increase Schulkers's bond, arguing that the injuries sustained by the victim warranted an increase to a $15,000.00 cash bond. The Commonwealth also represented that Schulkers was under the influence of prescription drugs which were found in her car.

In her response to the Commonwealth's request for an increase in the bond, Miller provided an affidavit from a nurse who personally knew Schulkers and argued, at length, explaining the defense's position was that Schulkers had not been intentionally impaired but suffered an emergent condition that she could not foresee due to gabapentin she had been taking as prescribed. The representations made by Miller at this hearing concerning Schulkers's medical conditions and the medications she was taking at the time of the incident would ultimately be the basis for the trial court later granting a motion made

2

by the Commonwealth to disqualify Miller. The relevant statements made by Miller must be considered *in toto* within our analysis and were as follows:

> [W]e believe that this accident was caused by her suffering a medical emergency. Nothing to do with her prescription medications that she was on or intoxication. This is confirmed by her medical records from that night, which I have received, and an affidavit which I have received from her friend who is also a nurse, Melissa Fleckinger, who is here. She was at Ms. Fleckinger's residence less than fifteen minutes before this accident occurred. She stood next to her vehicle to show her a burn on her stomach and was not swaying, did not appear intoxicated, no slurred speech, nothing. Was completely fine. That points to this being an acute injury, an acute issue.
>
> When this occurred, she was taken to St. Elizabeth Hospital. Her EGFR rates, which are your kidney levels, were at 29. The recommended kidney levels are over 60. When these levels drop like that, it is my understanding that what that means is that your body is not filtering out the medication that you have taken in on your normal medication schedule. It can happen acutely, and that is what happened in this case. If somebody is driving and had a heart attack that had no idea that they were at risk of doing so and she had been on this medication, had no idea that this was a risky medication, was never warned about this, and has since talked to her doctor and taken herself off of this medication because this occurred, we would not say that they had . . . .
>
> She's a nurse. She was a nurse, yes judge . . . .
>
> [S]he told her doctor she did not want to be on this medication that could potentially have this consequence, Judge. So she has taken steps — another step that she has taken is that she went and surrendered her driver's license and exchanged it for just an identification card. She has not driven since this happened, she has sold her vehicle to her son, who had to take out a loan to pay her bond. So that's why she has sold her vehicle to him. As I've said, she has taken herself off that medication, she has literally no criminal history, background as a nurse, and does have several severe medical conditions including Meniere's disease, Sjogren's disease, prediabetic, fibromyalgia, ulcer, anemia, hypothyroidism, and is on a lot of different medications but has been taking them as prescribed. The bottles that the police officers on scene said did not have the correct count is honestly, sorry it's comical, because the date on some of these bottles is like from September. Her

oxycodone. The reason for that is she gets prescribed up to 150 of these different pills a month. That is a large bottle, that is a large number of pills, especially of something that is a controlled substance to have on your shoulder as an elderly woman. She also has a daughter who has a substance abuse issue. Because of that, and her background as a nurse, she purchased herself a safe in her home and that's where her medication is stored. She only brings with her what might possibly be needed for that day's medical dosage.

We look forward to proving she was taking her medication as required with the blood test results, which she submitted to freely and willingly Judge.

She has literally no criminal history, has the background as a nurse, and does have several severe medical conditions, including Meniere's disease, Chauvin's disease, pre-diabetic, fibromyalgia, ulcer, anemia, hypothyroidism, and is on a lot of different medications, but has been taking them as prescribed.

We look forward to proving that she was taking her medication as required with the blood test results, which she submitted to freely and willingly[.]

The trial court noted the mention of Schulkers's oxycodone prescription and asked, "That's five pills a day. Why is she even driving?" Miller responded stating:

Judge, she has been on these medications for all of these hosts of . . . she has . . . for a long time, has not had an issue before, it does not make her intoxicated. She takes them on therapeutic levels for a medical need. She does not all the time take five a day, Judge. It's as needed for pain.

But it is all legally prescribed through one doctor, she is not pain-doctor shopping or anything like that, it is all through St. Elizabeth. She has also taken steps and has several upcoming doctor's appointments, including one with a nephrologist, which I didn't know if that's a kidney-only doctor. She was never referred to a nephrologist before this, did not know that this was a potential side effect of the gabapentin.

. . . .

4

[T]aken within therapeutic levels, they can just address pain and not result in impairment or intoxication. We have seen that with people that have been taking pain pills to manage you know, hips that have been replaced, for years. They are not getting intoxicated off the pain pills, they are just managing the pain in an appropriate level. That's why she goes through her doctor and has even herself taken the step to go to a pain management specialist to start getting ablations, which are injections to kill the nerves that are causing this pain to get off of the medication, Judge. But, as I said, has been on these medications, well the oxycodone specifically, for years, and has not had a problem. Now the medications do say that you need to take caution . . . .

Her EGFR rates which are your kidney levels were at 29. The recommended kidney levels are over 60. When these levels drop like that, it's my understanding that what that means is that your body is not filtering out the medication that you have taken in on your normal medication schedule. It can happen acutely and that is what happened in this case if somebody was driving and had a heart attack that had no idea that they were at risk of doing so.

. . . .

[S]he had been on this medication had no idea this was a risk of the medication was never, uh, and has since talked to her doctor and taken herself off of this medication because this occurred.

She was never referred to a nephrologist before this, did not know that this was a potential side effect of the gabapentin.
She was never warned that this kidney issue could happen. These kidney levels, which I intend to seek an expert to prove are something that can happen acutely and was the cause of this accident, not her legally prescribed medications or intoxication. That is not something that she was ever warned about. That was not something she would have known. She was suffering a medical emergency, but regardless that is taking her medications as prescribed, and it does mention gabapentin which causes the kidney issue.

If this was a medical emergency, that is not lack of conduct, I believe that once we are able to retain our expert and, uh, provide these medical records, we will prove to the Commonwealth that this was not indeed a crime at all. It was instead a tragic medical issue that was acute, and she was unaware it could possibly happen.

5

Over a year later, on February 24, 2023, the Commonwealth filed a "notice of potential conflict" alleging that Miller had a conflict based on the statements she had made at the arraignment, asserting Miller:

> [A]rgued that the collision occurred because Petitioner suffered an acute medical emergency due to an unanticipated effect of her prescribed Gabapentin on her kidneys. At the time of the arraignment, defense counsel indicated that she would present this information at trial through medical records and expert testimony.

The Commonwealth's representations were a fair summary of the statements made by Miller at the arraignment. However, the Commonwealth also noted that since then, Schulkers had filed pretrial disclosures indicating that a named physician would testify that Schulkers was not intoxicated but simply had a speech impediment—without mentioning gabapentin, kidney function, or an emergent medical condition. According to the Commonwealth, this meant that Miller could be a necessary witness at Schulkers's trial because Miller's prior statements were contradicted by Schulkers's own medical expert.

Miller filed a response on behalf of Schulkers which noted that the Commonwealth had not specified how Miller could testify on behalf of Schulkers or why she would. At a pretrial hearing on February 27, 2023, the parties discussed the Commonwealth's "notice" with the trial court. The Commonwealth represented it did not intend to call Miller because the statements were made in open court and available via the trial court's video

6

record and could be introduced for impeachment purposes during cross-examination as an admission of a party through their representative.[1]

According to the Commonwealth, if Miller decided that she needed to "explain" the statements she had made, she could call herself, or be called by another counsel, to testify on behalf of Schulkers thereby violating Supreme Court Rule (SCr) 3.130(3.7)(a) which generally prohibits attorneys from serving as counsel and witnesses on behalf of clients. The Commonwealth specifically stated:

> My purpose in filing the motion . . . . Is because so that Ms. Miller has explained it to the court, but if she feels that she is going to need to explain it to a jury then she does become a witness for her client, I suppose, in which case I believe that the rules then would say that there is a conflict of her multiple, I mean the standards of professional conduct talk about the multiple roles that we play as attorneys.
>
> And so, that's why I filed it as a notice. I'm not saying that she is now disqualified, I believe that decision would be hers or her client's strategic decision that they would need to make, but that's why I put everyone on notice now, but that information that she believes that she needs to testify to explain that information then, we can know, rather than on a recess.

---

[1] Kentucky Rules of Evidence (KRE) 801A(b) states in relevant part:

Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is . . . (3) A statement by a person authorized by the party to make a statement concerning the subject; [or] (4) A statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]

The trial court made no ruling on the Commonwealth's notice[2] and did not indicate its position on the matter other than stating Miller was "on notice."

Almost eight months later, on October 17, 2023, Schulkers's trial began but was adjourned following completion of *voir dire* and jury selection. During the course of the day, Schulkers had begun experiencing difficulty breathing and later that night, on the advice of her nephrologist, went to a local hospital where testing showed low potassium levels. Schulkers was admitted to the hospital and given a potassium infusion.

The next morning, Miller filed a motion for mistrial and continuance. Miller's motion contained not only a representation of the medical facts underlying her motion, but also accusations made against both the Court and the Commonwealth. Miller wrote, "[a]t this point, Defense Counsel has no choice but to believe that this Court and the Commonwealth are taking out their frustrations with Defense Counsel's zealous advocacy on Ms. Schulkers, which is completely improper, and cannot be tolerated."[3]

Miller's allegations of misconduct were addressed by the trial court which stated that it found the accusations "insulting." The Commonwealth went further in its response stating that it believed the motion was an improper delaying tactic, Schulkers condition was not unexpected or emergent and "[e]verything that they have done in this case has been an attempt to stall it."

---

[2] No motion had been made and no accompanying order was tendered by the Commonwealth.

[3] The Court notes the record lacks evidence to support this serious allegation.

8

The Commonwealth went even further, again bringing up the representations made by Miller at the arraignment and arguing the Commonwealth had evidence contradicting Miller's statements including alleging that Schulkers was opioid dependent. The Commonwealth stated:

> At her initial bond argument and arraignment, the first time that I asked for a bond commensurate . . . consistent with the charges, she represented to the court that the defendant was treated on the night of the collision because her EGFR rate suddenly dropped from where they should have been over 60, down to 29, causing an acute medical emergency, and that the defendant would have no reason to believe that she would have a kidney issue or that her gabapentin would affect her in that way. What we found from the medical records is that she had chronic kidney failure for years, that her EGFR rates were ALWAYS between 30 and 59, and that she had previously reported that gabapentin had adverse affects on her body and she believed that she was allergic to it.
>
> So all of those misrepresentations are exactly that, and when Ms. Miller made them, she claimed that she did it based on medical records that were in her possession. That can't be true because the medical records are inconsistent with what she said.
>
> She also made the bond argument on that day that the defendant herself has taken steps to ensure that this never happens again, because she herself stopped taking the medications that would have caused this issue and has stopped taking pain medications when not only the medical records that Ms. Miller provided, but the KASPER [Kentucky All Schedule Prescription Electronic Reporting] report shows that that never happened, this defendant continued to fill her opioid prescriptions after this collision, after Ms. Miller made that argument, until a different doctor came in in February of 2022, and diagnosed her with opioid dependence and told her she would no longer fill the opiates she was seeking and that the doctor told her she needed to see a pain management specialist.
>
> So, it is really difficult for me to believe that this was an acute medical injury or acute medical emergency because of a kidney issue that no one could have predicted when the only thing that I can be certain of from these medical records is that everybody has known since 2016 that this woman needs to be prepared for what is going to happen to her kidneys.

9

After the Commonwealth's arguments, Schulkers's motion for a mistrial was granted.

Eight days later, on October 26, 2023, the Commonwealth filed a motion to disqualify Miller from representing Schulkers based on statements made by Miller at the January 4, 2022, bond hearing and later statements she had made to the trial court "interpreting or explaining" her original representations.

The Commonwealth cited SCR 3.130(3.7)(a) and this Court's opinion in *Zurich Ins. v. Knotts*, 52 S.W.3d 555 (Ky. 2001), for the proposition that Miller had now taken "the dual role of witness and advocate" and alleged the "statements made by Ms. Miller are important proof at trial because they go to the only contested issue, they will certainly conflict with other testimony, and they are unattainable from any other source, so that the conflict rises to the level to justify disqualification."

Miller responded that she had not, and was not, attempting to explain her prior statements but was attempting to correct misleading descriptions of those statements, and that the prior statements were inadmissible.

The trial court held a hearing on the motion beginning on November 7, 2023. At the hearing, Miller argued:

> I don't understand how the Commonwealth can say that they can use statements of an attorney where we're talking about what we've seen in medical records in avenues of defenses we're exploring and try to use those as some sort of fact or rebuttal against my client's statements.
>
> I don't think that any of this is proper, I don't think that any of this is admissible, I don't think any of this needs privilege, I don't think any of this is relevant, Judge. And I don't think that I can testify or

10

offer any testimony at all regarding medical conditions. Especially when everything that was said was couched in "we believe" or "this points to" and I talked about the fact that I was seeking expert funding assistance to be able to explore these issues.

On December 5, 2023, the trial court reconvened its hearing and indicated that it had decided to disqualify Miller from the case. An order to that effect was entered the next day. The order stated in relevant part:

> The Commonwealth explained that it intended to show that Defendant knowingly ingested her prescribed medications in a manner that would create a grave risk of death to another if she drove a vehicle thereafter.
>
> The assertions made by defense counsel in open court prior to trial cannot be used to prove Defendant's wanton conduct but can be used for impeachment. Should that door be opened at trial it seems obvious to the court that defense counsel will need to explain why she made such comments in court regarding the reason why Defendant appeared intoxicated to the police. First, Defense counsel's statements made in representation of her client in open court while the client is present during arraignment and other bond hearings is not protected by attorney/client privilege.
>
> Second, there are many variables during trial. The court and counsel cannot predict the responses to every direct and cross examination [sic], however, this particular issue regarding Defendant's understanding of the effects of her medication and the potential danger of driving after taking her medication in the manner that she took it on the day of the collision, will necessarily be addressed at trial by the Commonwealth. The likelihood that defense counsel's statements will be introduced for purposes of impeachment is substantial.
>
> While Defendant has a right to choose counsel, she currently has a public defender. She does not have a right to choose which public defender is assigned to her. That being said, the court has weighed any prejudicial effect to Defendant to have a different attorney try her case against the prejudicial effect of allowing the current counsel to proceed as trial counsel.
>
> Two experienced and competent attorneys from the Department of Public Advocacy have been present and participated in hearings

11

before the court. The second attorney, Hon. Sheena Baylon, has filed at least one pleading (Motion to Reduce Bond) and argued its merits.

The Court believes the probability that Hon. Amy Miller's statements will be introduced at trial is substantial, and if they are and she is acting as trial counsel, she would not be able to testify to explain them. That puts her client in a precarious situation. The court believes that Hon. Amy Miller cannot effectively represent Defendant with her hands tied in the manner created by this situation.

Arguing that the trial court erred in its determination to disqualify Miller, on February 26, 2024, Schulkers filed a petition for a writ of prohibition before the Court of Appeals to prevent enforcement of the trial court's order disqualifying her counsel of choice. While awaiting a decision on the petition for a writ of prohibition, on March 27, 2024, Schulkers filed a motion for a continuance with the trial court. Following a hearing on April 8, 2024, in which Baylon noted that this was the first setting at which she had represented Schulkers as sole counsel, the trial court denied the motion for continuance, ruling that Schulkers's trial would proceed as previously scheduled on April 16, 2024.

On April 9, 2024, Schulkers filed a motion for emergency and immediate relief seeking a stay of proceedings before the trial court. In support of this motion, Baylon filed an affidavit explaining she did not feel qualified to proceed to represent Schulkers at trial, explaining "Ms. Miller has intimate knowledge of the case and its history that I do not possess, and I believe her participation is essential to the proper presentation of the defense. Ms. Schulkers strongly opposes Ms. Miller's disqualification for this reason."

12

On April 11, 2024, the Court of Appeals granted Schulkers's motion and granted her a stay from further proceedings before the trial court including the currently scheduled jury trial, pending resolution of the petition for a writ of prohibition. On July 17, 2024, the Court of Appeals denied Schulkers's petition determining that she would not qualify for a writ because she had an "adequate remedy by appeal" were she to be convicted. Schulkers appealed to this Court as a matter of right.

## II. ANALYSIS

We must decide one question first before analysis of the trial court's underlying determination to disqualify Miller. The issue is whether the Court of Appeals was correct that a criminal defendant whose counsel was disqualified possesses an "adequate remedy by appeal" which bars her from obtaining a writ of prohibition.

If we agree with the Court of Appeals, our inquiry ends. If, however, we determine Schulkers's right to a direct appeal (should she be convicted) is inadequate under the circumstances, only then will we determine if the trial court acted erroneously. The Commonwealth solely argues on appeal that Schulkers has an adequate remedy by appeal and will not suffer an irreparable injury, rather than making any argument that the trial court's order disqualifying Miller was valid and appropriate.

13

**A. Do Criminal Defendants Qualify for Review of Writs of Prohibition or do They Have an "Adequate Remedy by Appeal" if Their Counsel is Disqualified?**

**1. Standard of Review For Consideration of Writ Petitions**

In this action, Schulkers seeks extraordinary relief pursuant to CR 81 in the form of a second-class writ of prohibition.[4] By its nature, extraordinary relief is reserved for circumstances where the right of appeal from a final judgment will be inadequate, or where a trial court's action will damage our judicial processes. In *Bender v. Eaton*, 343 S.W.2d 799, 800 (Ky. 1961), the Court analyzed the law relating to extraordinary writs and counseled caution in entertaining petitions stating:

> This careful approach is necessary to prevent short-circuiting normal appeal procedure and to limit so far as possible interference with the proper and efficient operation of our circuit and other courts. If this avenue of relief were open to all who considered themselves aggrieved by an interlocutory court order, we would face an impossible burden of nonappellate matters.

A petitioner's allegations of error alone do not justify extraordinary relief under CR 81. Under our standards a writ for extraordinary relief may only be granted upon a showing by the petitioner that:

> (1) the lower court is proceeding or is about to proceed outside its jurisdiction and there is no remedy through an application to an intermediate court; or (2) that the lower court is acting or is about to act erroneously, although within its jurisdiction, and there exists no adequate remedy by appeal or otherwise and great

---

[4] Schulkers added a request for a special class writ in her reply brief. As we can more appropriately analyze and resolve this appeal pursuant to her request for a second-class writ, we decline to engage in any analysis as to whether a special class writ might be an alternative basis for relief.

injustice and irreparable injury will result if the petition is not granted.

*Cline v. Weddle*, 250 S.W.3d 330, 334 (Ky. 2008) (quoting from *Hoskins v. Maricle*, 150 S.W.3d 1, 10 (Ky. 2004)).

In *Bender*, our predecessor Court explained the two-stage analysis to be performed in examining a "second class" error:

> In the second class of cases relief ordinarily has not been granted unless the petitioner established, as conditions precedent, that he (a) had no adequate remedy by appeal or otherwise, *and* (b) would suffer great and irreparable injury (if error has been committed and relief denied). *See Manning v. Baxter*, 281 Ky. 659, 136 S.W.2d 1074 [(Ky. 1940)]; *Smith v. Shamburger*, 314 Ky. 850, 238 S.W.2d 844 [(Ky. 1951)]. This is a practical and convenient formula for determining, *prior to deciding the issue of alleged error,* if petitioner may avail himself of this remedy. As a general rule, if he has an adequate remedy by appeal or otherwise, or will not suffer great and irreparable injury, the petition should be dismissed forthwith.

*Bender*, 343 S.W.2d at 801.

Only after finding that a petitioner has passed test (a), the proper procedural method is to then apply test (b) to determine whether or not the petitioner, even though lacking an alternate adequate remedy, will suffer great and irreparable injury. This means something "ruinous" in nature. *Osborn v. Wolfford*, 39 S.W.2d 672, 673 (Ky. 1931); *Reeves v. Bell*, 147 S.W.2d 711, 714 (Ky. 1941).

From the foregoing, it should be clear that showing both lack of an adequate remedy by appeal ***and*** great and irreparable injury amount to a threshold for one seeking extraordinary relief based on error within the trial

15

court's jurisdiction. Until this threshold is met, questions of trial court error do not arise. *Bender*, 343 S.W.2d at 801.

## 2. The Availability of Writs to Criminal Defendants

This Court has never before been faced with the specific issue of a criminal defendant's right to a writ of prohibition following disqualification of her own counsel. The Court of Appeals could therefore only look to related, but distinguishable, precedent when it determined Schulkers's later right to an appeal, should she be convicted, was a sufficient safeguard.

The Court of Appeals found Schulkers's citations to our prior opinions in *Zurich*, 52 S.W.3d 555, *Marcus v. Scorsone*, 457 S.W.3d 710 (Ky. 2015), and *Harkins v. House*, 638 S.W.3d 346, 352 (Ky. 2021), to be unpersuasive because "these cases are inapplicable because they deal exclusively with disqualification of attorneys in civil cases," noting a distinguishing characteristic between attorney disqualification issues in civil and criminal matters because "disqualification of an attorney is not an appealable issue in civil cases and therefore no adequate remedy exists." *Harkins*, 638 S.W.3d at 352.

Conversely, in the criminal context, the Court of Appeals found that we had previously considered that the disqualification of counsel is an issue that is reviewable on direct appeal by a criminal defendant. *See Turner v. Commonwealth*, 544 S.W.3d 610 (Ky. 2018). The implications of our opinion in *Turner* bear further analysis because its relevance to these present proceedings is questionable.

16

In *Turner*, the Court heard an appeal as a matter of right of a criminal matter where the defendant's assigned co-counsel had been disqualified by the trial court due to him previously representing the victim in proceedings that were relevant to his ultimate murder.[5] The appellant had not sought a writ of prohibition at the time of her co-counsel's disqualification and therefore there was no consideration of whether or not she *could* have previously qualified for that remedy under our standards.

We must also note that in *Turner*, Doug Crickmer had been appointed as counsel for the defendant in 2010 at the time of her arraignment and Crickmer continued as defendant's counsel through her trial in 2016. Casey Holland, who would later be disqualified, was not appointed as a co-counsel for Turner until "late 2014" and was almost immediately disqualified. *Id.* at 620. Under that set of circumstances, the impact on Turner of the loss of her co-counsel would have been negligible at best and our opinion shows no analysis relating to Turner having alleged she suffered any substantive disadvantage from Holland's disqualification much less the "great injustice or irreparable injury" which would have warranted the issuance of a writ of prohibition.

Criminal appellants, like the one in *Turner*, do have a right to ultimately appeal the disqualification of their counsel if convicted, however, that should not necessarily mean they may not, under any set of circumstances, have a

---

[5] The disqualified co-counsel had been assigned to represent the victim on charges of assault in the fourth degree (domestic violence) against the female, Turner, who would kill him soon thereafter.

right to immediate review by way of a writ. In sum, an "available appeal" cannot always be considered an "adequate remedy." Here, the Court of Appeals did not analyze or describe how Schulkers's "available appeal" would constitute an "adequate remedy" which is a focus of our standard.

The idea that a direct appeal, following conviction, could adequately protect the interests of a criminal defendant, who was separated from the lead counsel who had prepared her defense and stood ready for trial, is uncertain if not dubious. Assuming *arguendo* that Schulkers was convicted, how would any appellate tribunal be able to discern, short of the obvious ineffective assistance of substitute counsel—a matter usually not raised or addressed in a direct appeal[6]—whether a guilty verdict was derived only due to the replacement of Schulkers's original counsel. As an academic matter, barring "overwhelming evidence of guilt," that question would be speculative.

Further, the existence of "great injustice and irreparable injury" from the discharge of a defendant's primary counsel at the end-stage of lengthy criminal proceedings may be presumed. The phrase has been defined by this Court as "incalculable damage to the applicant . . . *either to the liberty of his person*, or to his property rights, or other far-reaching and conjectural consequence." *Hoskins*, 150 S.W.3d at 19. Here, it is indisputable that Schulkers's *liberty* is at stake, and we have always held that disqualification is a drastic measure which

---

[6] Rules of Criminal Procedure (RCr) 11.42.

courts should be hesitant to impose except when absolutely necessary. *See University of Louisville v. Shake*, 5 S.W.3d 107 (Ky. 1999).

Criminal defendants, *in addition to* the interest civil litigants have in the resolution of counsel-disqualification issues by means of writs, have rights implicated under the Sixth and Fourteenth Amendments to the United States Constitution and Sections Two, Three, Seven, and Eleven of the Kentucky Constitution. The United States Supreme Court recognized the Sixth Amendment's guarantee of assistance of counsel also includes a right to counsel of one's choosing. *Wheat v. United States*, 486 U.S. 153, 164 (1988). While not an absolute right, there is a "presumption" in favor of petitioner's counsel of choice. *Id.*

We recognize that an indigent defendant does not have the right to counsel of her choice at the *onset* of representation when assigned to be represented by the Department of Public Advocacy. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). However, we conclude that when such a defendant has been represented by the same counsel for a protracted period of time, that counsel is available to continue in the representation, and the defendant wishes to have such counsel continue in the representation, this combination of factors gives the defendant an interest in maintaining such counsel's representation as "counsel of choice" under the Sixth Amendment.

"Disqualification separates a party from the counsel of its choice with immediate and measurable effect." *Zurich*, 52 S.W.3d at 560. In *Zurich*, like here, the disqualified attorney had "lived through the previous litigation from

19

its inception and has in his memory, or at his fingertips, knowledge of the case no one else could duplicate." *Id.* In the context of a writ of mandamus, our Court determined in *Zurich* that the Court of Appeals had been correct in finding that disqualification of an attorney "would work a substantial hardship upon the [client] and would result in irreparable harm." *Id.* at 560. The attorney in *Zurich* was already deeply involved in the litigation and had litigated the related negligence case "from its inception." *Id.* The attorney also had "unique knowledge and familiarity with the underlying facts in that action," *id.* at 557, and "knowledge of the case no one else could duplicate," *id.* at 560. There was also a "degree of confidence and trust . . . between the [clients] and [the lawyer]" that could "not be replaced." *Id.* Moreover, the potential rationale for disqualification was speculative, since it would only occur if the lawyer was actually called as a witness.

In reaching our decision as to whether or not to entertain a writ petition under the circumstances presented here, we must remain cognizant of, and give specific attention to, the severity of the implications of disqualifying a criminal defendant's counsel. Because the question of disqualification directly implicates a defendant's Sixth Amendment rights "disqualification of defense counsel should be a measure of last resort, and 'the government bears a heavy burden of establishing that disqualification is justified.'" *United States v. Gearhart*, 576 F.3d 459, 464 (7th Cir. 2009) (quoting *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986)); *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986) ("In seeking to disqualify a defendant's chosen

20

counsel, the government bears a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualification."). *See also Owen v. Wangerin,* 985 F.2d 312, 317 (7th Cir. 1993) ("Attorney disqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary.'") (quoting *Schiessle v. Stephens,* 717 F.2d 417, 419–20 (7th Cir. 1983)); *Evans v. Artek Systems Corp.,* 715 F.2d 788, 794 (2d Cir. 1983) (holding that the moving party bears a "heavy burden of proving [the] facts required for disqualification.").

Due to the constitutional implications of ordering the "drastic measure" of disqualifying a criminal defendant's counsel and the "heavy burden" on the state of proving the necessity of such a remedy, such event is a rare occurrence which appears seldomly in published precedent. When such does occur, however, courts of other states appear to welcome review by way of writs of prohibition.

In the Missouri Supreme Court case of *State ex rel. Kinder v. McShane,* 87 S.W.3d 256, 262-66 (Mo. 2002), the state moved to disqualify a murder defendant's counsel due to potential conflict based on counsel's representation of both defendant and defendant's father, who was a key witness for prosecution. The trial court granted the motion and defendant petitioned for writ of prohibition. The Supreme Court issued a "preliminary writ of prohibition" before reviewing, *en banc,* the trial court's findings and ultimately determining the trial court had abused its discretion in rejecting the defendant's waiver of actual conflict of interest.

21

Similarly, the West Virginia Supreme Court, in the matter of *State ex rel. Yurish v. Faircloth*, 847 S.E.2d 810, 812 (W.V. 2020), heard an original action for a writ of prohibition after the state had moved to disqualify counsel from representing the petitioners because, it argued, the joint representation created a current conflict among the petitioners' interests and threatened future conflicts that would jeopardize the integrity of the proceedings. The circuit court granted the state's motion, and the petitioners sought a writ from the West Virginia Supreme Court which entertained the petition to prohibit the circuit court from enforcing its order. While the writ was ultimately denied by the Court, the ability of the criminal defendants to seek a writ, and have an appellate court review a trial court's interlocutory disqualification order, was affirmed.

Criminal defendants are constitutionally entitled to receive fair trials, and we should not satisfy ourselves with the solace of a later direct matter of right appeal conducted at leisure while the defendant is most likely incarcerated.

Here, Miller represented Schulkers continuously from her arraignment, in January of 2022, through the second day of her (mis)trial. Presumably, without the intervention of her disqualification, Miller would have been able to immediately defend Schulkers whenever her second trial was scheduled. Miller's personal knowledge of the facts and nuances of Schulkers's case are established by the record and Schulkers's desire that Miller continue to defend her. We would also note that attorneys are not fungible commodities; their talents, abilities and effectiveness all differ. Co-counsel for Schulkers, Baylon,

22

stated that she lacked the "intimate knowledge of the case and its history" that Miller had, and opined that Miller's "participation is essential to the proper presentation of the defense." While we would hope that every indigent defendant would get the same level of competent and effective representation from appointed counsel, we should be ready—unless given a substantive reason otherwise—to defer to the "presumption" in favor of appointed attorney the defendant desires to keep, has good reason to keep, and who has represented that defendant from the outset.

Schulkers has satisfied our standards for consideration of a discretionary writ of prohibition. Her remedy by later direct appeal after conviction of such a crucial ruling would be inadequate. Having determined this threshold question of Shulkers's right to interlocutory review under these circumstances, this Court will now address the substance of the Commonwealth's motion to disqualify and the trial court's determination.

### B.   Did The Trial Court Err in Disqualifying Schulkers's Counsel Due to The Potential She Would Be a Witness at Trial?

We generally review a trial court's ruling on a motion to disqualify an attorney for abuse of discretion. *Calhoun v. Commonwealth*, 492 S.W.3d 132, 138 (Ky. 2016). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Additionally, though, our Court and the United States Supreme Court have developed more specialized and intensive standards when a litigant alleges their opponent's counsel is, or has become, a witness in the action and

may not serve as their adversary's counsel whether that be in the civil or criminal context.

We have held that disqualification is a "drastic remedy" that should be used sparingly, but that it is nevertheless appropriate in some cases. *Shoney's, Inc. v. Lewis,* 875 S.W.2d 514, 516 (Ky. 1994). However, while Schulkers enjoys protections of the Sixth Amendment not shared by civil litigants, "[t]here is no unqualified right to . . . choice of counsel." *Maricle,* 10 S.W.3d at 121. Again, the Sixth Amendment's guarantee of assistance of counsel also includes a right to counsel of one's choosing, however, that right is not absolute. *See Wheat,* 486 U.S. at 164 ("The [trial court] must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.")

In regard to being a witness, or potential witness, at the trial in which an attorney is representing one of the parties, Kentucky courts have repeatedly held that "when a lawyer is a witness for his client, except as to merely formal matters, . . . he should leave the trial of the case to other counsel." *Morrison's Administrator v. Redmon,* 287 S.W.2d 167, 168 (Ky. 1956).

In the 4-3 decision in *Zurich,* 52 S.W.3d at 562-63, our Court ultimately differed on whether or not an attorney had been properly disqualified as "likely a necessary witness," but we agreed upon the proper analysis of the issue starting with Rule 3.7 of SCR 3.130 which states:

24

(a) A lawyer shall not act as an advocate at trial in which the lawyer is likely to be a necessary witness except where:

(1) The testimony relates to an uncontested issue;

(2) The testimony relates to the nature and value of legal services rendered in the case; or

(3) Disqualification of the lawyer would work a substantial hardship on the client.

We then explained:

The commentary to the Rule 3.7 explains that the party's right to choice of counsel must be weighed against the unfair prejudice created when that attorney testifies:

[A] balancing is required between the interests of the client and those of the opposing party. Whether the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses. Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified due regard must be given to the effect of disqualification on the lawyer's client.

*Zurich*, 52 S.W.3d at 558.

In *Zurich*, we also looked to the Texas opinion in *Warrilow v. Norrell*, 791 S.W.2d 515 (Tex. App. 1989), for guidance, favorably observing "[t]he *Warrilow* court, noted that disqualification of an attorney sought to be called as a witness for the opposing party is subject to *a more stringent standard* because 'a litigant may call his or her opponent's attorney as a trial tactic, seeking to disqualify the attorney from the case.'" *Zurich*, 52 S.W.3d at 559 (emphasis added). In deference to litigants whose attorney faces disqualification, we added

25

"[t]he crucial inquiry in determining whether an attorney can act as both an advocate and a witness is the prejudicial effect it will have upon the attorney's own client," and while "the opposing party may have a proper objection where the combination of roles would prejudice that party's rights in litigation . . . balancing is required between the interests of the opposing parties lest the rule be used as a tactical weapon for expense, delay, inconvenience, and sequestration of a witness." *Id.* at 559-60.

A majority of our Court determined:

> Attorney [] has lived through the previous litigation from its inception and has in his memory, or at his fingertips, knowledge of the case no one else could duplicate. Moreover, regardless of the level of competency of a successor attorney, the degree of confidence and trust that has developed between the [party] and [attorney] cannot be replaced. [Attorney] has stated that he will not be called to testify on behalf of the [client] and, in fact, has no information that it is crucial to the [client's] claims against Zurich. We agree with the Court of Appeals that disqualification of Franklin would work a substantial hardship upon the [client] would result in irreparable harm.

*Id.* at 560.

While Schulkers is a criminal defendant with a liberty interest at stake not presented in *Zurich,* we readily note the similarities between the facts presently presented and those found in *Zurich* and share the *Zurich* Court majority's views and conclusion. Although there may be times when the disqualification of a criminal defendant's counsel is both proper and necessary, the showing of prejudice by the Commonwealth needed to disqualify opposing counsel must be more stringent than in obvious circumstances, not present

26

here, where the attorney is an actual witness to material facts of the underlying crime.

"Arguments of counsel are not evidence." *Mason v. Commonwealth*, 331 S.W.3d 610, 624–25 (Ky. 2011). More specifically, as noted in *Lewis v. Commonwealth*, 475 S.W.3d 26, 32 (Ky. 2015), the opinion of defense counsel as to whether a defendant acted intentionally in committing a crime is *not* of evidentiary relevance.

The totality of Miller's representations show she was acting as an advocate at that early stage in her representation (and initial phase of the litigation), in interpreting the extremely limited evidence before her and offering a preliminary opinion as to a probable defense based on what she had learned thus far and not acting as a material witness. Her representations which were made as an advocate and not as a witness, rested on claims she made regarding Schulkers's medical conditions at the time of the accident based on her own non-expert review of the limited medical records then available to her, speaking to a witness, apparently talking with at least one physician, and—by implication—her own client.

The trial court's determination that "[t]he likelihood that defense counsel's statements will be introduced for purposes of impeachment is substantial" is also conjectural and speculative. Its decision was reliant upon several suppositions to support the disqualification of an attorney who had represented her criminal client as primary counsel from arraignment through to the beginning of her trial. Since the Commonwealth admits that it did not

27

intend to call Miller as a witness, for Miller to actually take the stand in Schulkers's defense, we would have to assume all of the following: (a) Shulkers would actually testify at her criminal trial; (b) Schulkers would testify to fact(s) that were materially refuted by what Miller stated to the trial court at the arraignment; (c) the Commonwealth would decide to attempt to play a video of the arraignment to the jury in order to impeach Schulkers; (d) the trial court would *actually permit* the introduction of the video of the arraignment; (e) Miller and Schulkers would decide that Miller must testify in rebuttal in order to explain her prior statements; *and* (f) the trial court would permit Miller to testify.

We cannot presently discern Miller's statements, even if ultimately attempted to be used for purposes of impeaching Schulkers, as being relevant. We can only ascertain an unfounded allegation by the Commonwealth that Miller will later attempt to violate attorney-client privilege despite her representations to the contrary. Evidence is only relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Kentucky Rules of Evidence (KRE) 401. Relevant evidence in a criminal case is that which "tends to prove or disprove an element of the offense." *Commonwealth v. Mattingly*, 98 S.W.3d 865, 869 (Ky. App. 2003) (citations omitted).

Even if Miller's statements somehow became relevant, the trial court could still properly exclude them pursuant to KRE 403 when, "[a]lthough

28

relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

If the trial court determined that Miller had made knowing misrepresentations to the trial court, it could consider sanctions against Miller under CR 11 or referral to the Kentucky Bar Association for violations of SCR 3.130 (3.1), which provides that "[a] lawyer shall not knowingly bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous[,]" or SCR 3.130(3.3) for "knowingly . . . mak[ing] a false statement of fact or law to a tribunal . . . [,] or "offer[ing] evidence that the lawyer knows to be false."

Regardless of the merits of the statements made by Miller, at present there is no genuine need for Miller to testify at trial for either party and the notion that she would eventually attempt to testify at trial is too speculative and remote to support her disqualification.

For all these reasons articulated today, this Court concludes the trial court's disqualification order was erroneous. A writ of prohibition barring its enforcement is the appropriate remedy.

### III.  CONCLUSION

The Court concludes that review of the disqualification order issued by the trial court in this case by way of a writ of prohibition is available under a

29

"second class" analysis, i.e. where there is no adequate remedy by appeal *and* the party would suffer great and irreparable injury.

Further, this Court concludes the Commonwealth's motion to disqualify Miller, and its arguments in support of such motion, while understandable, were insufficient to grant relief. The trial court's adoption of those arguments and its determination that the remote possibility that Miller might decide to call herself to testify on behalf of her client were clearly erroneous. The trial court's findings were insufficient to allow for disqualification of Schulkers's counsel under the standards we have restated herein.

For these reasons, a writ of prohibition barring enforcement of the Kenton Circuit Court's order is appropriate. The Court of Appeals' decision to deny the writ is therefore reversed, and this matter is remanded to that Court to issue the writ.

All sitting. Lambert, C.J.; Bisig, and Conley, JJ., concur. Conley, J., also concurs by separate opinion which Lambert, C.J.; and Thompson, J., join. Goodwine, J., concurs in result only. Nickell, J., dissents by separate opinion in which Keller, J., joins.

CONLEY, J., CONCURRING: I concur with the Court but write separately on an issue presented by this case; namely, the Commonwealth's expressed intent to use Miller's statements made at the bond hearing against her client if Schulkers were to testify and the trial court's implicit agreement to

30

admit such statements at trial.[7] Although statements by attorneys can constitute admissions, this issue more frequently arises in the context of opening statements made at trial. *Oscanyan v. Arms Co.,* 103 U.S. 261 (1880); *MacDonald v. General Motors Corp.,* 110 F.3d 337, 339-341 (6th Cir. 1997). Much rarer is the use of a lawyer's statement made in open court during an adversarial, pre-trial hearing.

I conclude Miller's statements at the bond hearing are not subject to KRE 801A(b) as adoptive admissions and, therefore, are not admissible at trial. Although Professor Lawson has noted that arguments made by lawyers can technically be considered admissions to be used against the client for impeachment on inconsistency under KRE 801A(b), he notes that "courts have urged caution . . . for fear that excessive use could impair the attorney-client relationship." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.25[2][b] (2022 ed.). He further describes the current trend amongst federal courts to be one of "considerable resistance to the use of such statements as evidence[.]" Professor Lawson concludes by endorsing the standard of the First Circuit Court of Appeals that a lawyer's statement should, at the very least, "be [a] clear and unambiguous" assertion of fact before it will be considered an admission. *Butynski v. Springfield Terminal R.Co.,* 592 F.3d 272, 277 (1st Cir. 2010). I agree. To protect the attorney-client relationship, as well as the

---

[7] If the trial court did not believe Miller's statements were admissible, then why disqualify her? The trial court's decision only makes sense if it implicitly assumed her statements are admissible. Without that basis the trial court's decision lacks any rationale whatsoever thus, arbitrary.

31

lawyer's ability to zealously advocate for their client, there should be a high bar to clear before statements made by a lawyer in open court during an adversarial hearing are considered admissions usable against their client on cross-examination at trial. I conclude Miller's statements at the bond hearing fail to meet the standard. Her arguments were based on a review of medical records from "that night [of the accident]," an affidavit from a nurse and friend of her client, and she unambiguously expressed her desire for a medical expert to explore and confirm her representations.

The Commonwealth's accusation that Miller's statements were "misrepresentations" depend upon us indulging the presumption that a lawyer, a public defender at that, after only a week of representation, would be fully informed and conversant with the entirety of their client's medical history. That is preposterous. The timeline of events is Schulkers was indicted on December 16, 2021. Miller was appointed counsel on January 3, 2022. The bond hearing occurred on January 10, 2022. I simply cannot believe it is reasonable to expect the lawyer of average competence to be familiar with any client's entire medical history after only a week of representation. And, as already noted, Miller made no such claim but instead predicated her statements on medical information from the day of the accident and an affidavit from a nurse.

Moreover, because these statements referred to a potential defense that would, if true, absolve Schulkers of criminal liability, they do not constitute admissions of fact but are statements made regarding a legal conclusion, i.e., whether Schulkers was guilty or not guilty of the crime charged. Statements by

32

counsel that can potentially be used as adoptive admissions "does not include counsel's statement of his conception of the legal theory of a case." *MacDonald*, 110 F.3d at 341 (quoting *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir. 1972)). In *MacDonald*, the Sixth Circuit refused to recognize statements made by General Motors' counsel during opening argument as admissions because those statements went to the ultimate issue: whether the driver of the vehicle was negligent and ultimately responsible for the accident. *Id.* This case is analogous as Miller's statements were articulating a theory of the case which, if true, went to the ultimate legal conclusion of guilt or innocence. Miller's statements, therefore, do not qualify as admissions under KRE 801(A)(b), and the basis upon which the trial court disqualified her is without merit.

To be clear, it is not to my mind the erroneous application of KRE 801(A)(b), in and of itself, that justifies issuing the writ. That is only a means to an end—the termination of the attorney-client relationship against the will of both the attorney and client. If the improper disclosure of privileged communications between an attorney and client threatens "the integrity of the attorney-client relationship[,]" justifying the issuance of a writ, then surely the erroneous disqualification of an attorney, over her and her client's protest, threatens the integrity of the attorney-client relationship. *The St. Luke Hospitals, Inc. v. Kopowski,* 160 S.W.3d 771, 775 (Ky. 2005); *see also State Farm Mut. Auto. Ins. Co. v. Edwards,* 670 S.W.3d 873, 881 (Ky. 2023) (holding threatened disclosure of attorney-client privileged material satisfies the prerequisites for issuance of a writ of the second class). In sum, I believe our

33

jurisprudence stands for the general principle that when judicial action threatens to undermine the attorney-client relationship, a writ of prohibition can lie to protect that relationship because it is a "foundation principle of Anglo–American jurisprudence" without which our law would lie in ruin. *Kopowski*, 160 S.W.3d at 775.

Accordingly, I conclude Miller's statements do not qualify as an admission under KRE 801A(b) and are inadmissible. Therefore, the trial court's disqualification of Miller based on the potential use of her statements against Schulkers is erroneous, and Schulkers will suffer an irreparable injury that cannot be adequately remedied upon appeal if the trial court is allowed to proceed with its disqualification of Miller as Schulkers' attorney. The Court of Appeals abused its discretion, and I concur in reversing and remanding for the issuance of the writ.

Lambert, C.J.; and Thompson, J., join.

NICKELL, J., DISSENTING**:** Respectfully, I dissent. Because the stringent standards for extraordinary relief were not satisfied in the present matter, I would affirm the Court of Appeals' denial of the requested writ.

When a trial court is proceeding within its subject-matter jurisdiction, the lack of an adequate remedy by appeal is a mandatory prerequisite to the issuance of an extraordinary writ. *Indep. Order of Foresters v. Chauvin*, 175 S.W.3d 610, 615 (Ky. 2005). This absolute requirement applies with equal force to the availability of a writ under the "certain special cases" exception. *Id.* at 617.

The disqualification of counsel in a criminal case is properly subject to review on direct appeal. *Turner v. Commonwealth*, 544 S.W.3d 610, 622 (Ky. 2018). Post-conviction review of a disqualification order is adequate to remedy any alleged violation of the Sixth Amendment right to counsel because "reversal for violation of such a right does not require a showing of prejudice to the defense, since the right reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding." *Flanagan v. United States*, 465 U.S. 259, 268 (1984) (rejecting availability of immediate appeal from a disqualification order under collateral order doctrine). Even assuming a requirement of prejudice, the validity of a disqualification order

> cannot be adequately reviewed until trial is complete. The effect of the disqualification on the defense, and hence whether the asserted right has been violated, cannot be fairly assessed until the substance of the prosecution's and defendant's cases is known. In this respect the right claimed . . . is analogous to the speedy trial right.

*Id.* at 268-69. Moreover, "[n]othing about a disqualification order distinguishes it from the run of pretrial judicial decisions that affect the rights of criminal defendants yet must await completion of trial-court proceedings for review. *Id.* at 270.

Our precedents have steadfastly refused to entertain writ petitions unless absolutely necessary. *Cox v. Braden*, 266 S.W.3d 792, 795 (Ky. 2008). "Because they fall outside the regular appellate process, especially when they are used as de facto interlocutory appeals (an increasing, undesired trend), writ

petitions . . . consume valuable judicial resources, slow down the administration of justice (even when correctly entertained), and impose potentially unnecessary costs on litigants." *Id.* Such considerations are especially prevalent in the instant matter where "the overriding policies against interlocutory review in criminal cases apply in full." *Flanagan*, 465 U.S. at 470. Because there is an adequately remedy by appeal from the present disqualification order, I would hold that extraordinary relief is not available. Therefore, I respectfully dissent and would affirm the Court of Appeals' denial of the requested writ.

Keller, J., joins.


COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Timothy G. Arnold
Assistant Public Advocates


COUNSEL FOR REAL PARTY IN INTEREST/
APPELLEE:

Russell M. Coleman
Attorney General

Stephanie L. McKeehan
Emily Jeannine Arnzen
Assistant Attorneys General


APPELLEE:


Hon. Kathleen Lape
Pro se